# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

**WENDELYN D. GOODRICH,**

    **Plaintiff,**

-vs-                                        Case No. 6:08-cv-973-Orl-28DAB

**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

The Plaintiff brings this action pursuant to the Social Security Act (the Act), as amended, Title 42 United States Code Section 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (the Commissioner) denying her claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits under the Act.

The record has been reviewed, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and the administrative record, and the pleadings and memoranda submitted by the parties in this case. Oral argument has not been requested.

For the reasons that follow, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **REVERSED** and **REMANDED**.

## *I. BACKGROUND*

### A.    Procedural History

Plaintiff filed for a period of disability, DIB and SSI benefits on September 16, 2002. R. 53, 126-28, 735-37. She alleged an onset of disability on February 24, 1999, following a accident when

she fell out of a golf cart and was dragged 50 feet, injuring her left arm and lower back. R. 32-36, 502, 780. Her application was denied initially and upon reconsideration. R. 65-68. Plaintiff requested a hearing, and two substantive hearings[1] were held on March 15, 2007 and June 28, 2007, before Administrative Law Judge James Russell (hereinafter referred to as "ALJ"). R. 741-803. In a decision dated July 30, 2007, the ALJ found Plaintiff not disabled as defined under the Act through the date of his decision. R. 53-64. Plaintiff timely filed a Request for Review of the ALJ's decision, and the Appeals Council denied Plaintiff's request on April 24, 2008. R. 8-10. Plaintiff filed this action for judicial review on June 16, 2006. Doc. No. 1.

### B. Medical History and Findings Summary

Plaintiff was born on January 20, 1973, and was 26 years old on her alleged onset date of February 24, 1999. R. 126, 134, 144, 776. She completed the twelfth grade and some college courses but never received a degree. R. 538, 776. Her past relevant work included positions as an office manager, a department secretary and receptionist, and a receptionist in medical offices from 1994 until 1999 and as a dispatcher at a police department from 1991 until 1993. R. 145, 163-70, 199-206, 236. Plaintiff attempted to return to work from October through December 2000 in an office job, but the County physician would not release her for work with the County. R. 154, 210, 496. Plaintiff noted on SSA forms that she was terminated in May 1999 from her office manager position at Florida Hospital when she could not return from short term disability[2] because of doctor's restrictions. R. 199, 210.

---

[1] The original hearing, scheduled for June 8, 2006, was merely continued when Plaintiff was ill and unable to attend. R. 804-07.

[2] Based on explanation in other records, it appears that Plaintiff was pregnant and entitled to maternity leave around the same time. It is not clear whether the short term disability was actually maternity leave or due to her injuries from the golf cart accident.

Plaintiff's medical history is set forth (for the most part) in detail in the ALJ's decision[3]. In summary, Plaintiff complained of supraventricular tachycardia, neuro-cardio syncopy and mitro valve prolapse, severe headaches, stomach problems, asthma, somatoform disorder, depression, allergies, back, neck, arm pain, extreme fatigue and weakness, and blurry vision. R. 68, 144, 207, 217. After reviewing Plaintiff's medical records and Plaintiff's testimony, the ALJ found that Plaintiff suffered from degenerative disc disease of the cervical and lumbar spine, a moderately sized central disc protrusion at L5-S1, supraventricular tachycardia, asthma, and a pain disorder, which were "severe" medically determinable impairments, but were not impairments severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. R. 55.

The ALJ determined that Plaintiff retained the residual functional capacity (RFC) to perform a significant range of light work, as she could lift twenty pounds occasionally and ten pounds frequently and sit, stand or walk six hours in an eight-hour workday, with normal breaks; he listed additional postural and environmental limitations. R. 60. In making this determination, the ALJ relied on the medical expert's testimony (R. 61, 753), and found that Plaintiff's allegations regarding her limitations were not entirely credible for the reasons set forth in the body of the decision. R. 62. Based upon Plaintiff's RFC, the ALJ determined that she could not perform past relevant work. R. 62. Considering Plaintiff's vocational profile and RFC, the ALJ applied the Medical-Vocational Guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2, and, based on the testimony of the vocational expert ("VE") taking into consideration Plaintiff's non-exertional impairments, the ALJ concluded that Plaintiff could perform work existing in significant numbers in the national economy as an office helper, cashier, and hand packager. R. 62-63. Accordingly, the ALJ determined that

---

[3]Portions of the ALJ decision miscited from one of the physician's reports, as is set forth in detail below.

Plaintiff was not under a disability, as defined in the Act, at any time through the date of the decision. R. 63.

Plaintiff now asserts four points of error. First, she argues that the ALJ erred by failing to include Plaintiff's GAF scores in the hypothetical to the vocational expert. Second, she claims the ALJ erred by failing to make findings in his decision concerning the side effects of medications on Plaintiff's ability to work. Third, Plaintiff contends the ALJ erred by finding she had the RFC to perform a significant portion of light work contrary to her treating physician's statement. Fourth, she asserts that the ALJ erred by improperly refusing to allow Plaintiff's daughter to testify and in failing to consider this proffered testimony in his decision. All points are addressed, though not in the order asserted by Plaintiff. For the reasons that follow, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **REVERSED** and **REMANDED**.

## *II. STANDARD OF REVIEW*

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla – *i.e.*, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson*, 402 U.S. at 401).

"If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n. 8 (11th Cir.

2004). "We may not decide facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner.]" *Id.* (internal quotation and citation omitted). *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

The ALJ must follow five steps in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, she is not disabled. 29 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering her residual functional capacity, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled. 20 C.F.R. § 404.1520(f).

### *III. ISSUES AND ANALYSIS*

#### A. Treating physician opinion

Plaintiff contends that the ALJ erred by stating in the decision that he gave "great weight" to the medical opinion of James K. Shea, M.D. (R. 62), Plaintiff's treating pain management physician (R. 493), excepting for Dr. Shea's opinion that Plaintiff could do less than sedentary work. R. 61. The Commissioner argues that the ALJ gave Dr. Shea's opinion the appropriate weight.

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See Lewis v. Callaghan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); 20 C.F.R. § 404.1527(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements.)

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987). When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) the medical evidence supporting the opinion; 4) consistency with the record as a whole; 5) specialization in the medical issues at issue; 6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984); *see also* 20 C.F.R. § 404.1527(d)(2).

Plaintiff contends that, on the issue of Plaintiff's limitations, the ALJ appeared to give more weight to the opinion of a non-examining medical expert, Dr. Lorber, than to Dr. Shea's opinion. R.

62. Plaintiff argues that the ALJ's rejection of the opinion of Dr. Shea, a treating pain medicine physician, involved the application of an incorrect legal standard because the opinion of the non-examining ME is "entitled to little weight," citing several Eleventh Circuit cases. The Commissioner argues that the ALJ properly discounted Dr. Shea's medical source statement because it was not consistent with the other medical evidence of record, including his medical records. Neither the ALJ or the ME properly considered the most recent medical diagnosis from a cardiac specialist, Dr. Miles, who diagnosed Plaintiff with a condition that affects the nervous system.

Although Plaintiff does not raise the issue directly, the ALJ failed to address the most important opinion on Plaintiff's condition – that of Plaintiff's treating specialist/cardiologist, a Professor in the Department of Medicine, Division of Cardiology, at Shands HealthCare, Dr. Miles, who opined that Plaintiff suffered from "dysautonomic syndrome[4]." R. 708. The ALJ's failure to consider Dr. Shea's opinion in light of the diagnosis by Dr. Miles, and to properly consider Dr. Miles' diagnosis of Plaintiff with a nervous system disorder causing cardiac and other problems, was error.

Plaintiff was previously diagnosed with postural orthostatic tachycardia syndrome ("POTS"); Dr. Miles noted that Plaintiff had a tilt table test in 2003 that was positive for POTS. R. 710, 713-14 (April 2003). However, at the initial visit, Dr. Miles noted that Plaintiff had an elevated heart rate and blood pressure[5] both chronically and intermittently, which was "suggestive of a dysautonomic syndrome of which the [POTS] is one type." R. 711.

According to the National Institute of Health website, dysautonomia is defined as "a disorder of autonomic nervous system function."[6] The autonomic nervous system controls much of the body's

---

[4]Dysautonomia is defined as the abnormal functioning of the autonomic nervous system. STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

[5]Plaintiff brought Dr. Miles multiple blood pressure and heart rate recordings to review. R. 711.

[6]http://www.ninds.nih.gov/disorders/dysautonomia/dysautonomia.htm.

involuntary functions; symptoms of dysautonomia can include problems with the regulation of heart rate, blood pressure, body temperature and perspiration, fatigue, lightheadedness, feeling faint or passing out (syncope), weakness and cognitive impairment[7]. *See Salter v. Astrue*, Case No. 3:08-cv-189-RV-EMT, 2009 WL 1457125, *3-*4 (N.D. Fla. Apr. 1, 2009) (noting Plaintiff's dysautonomia is a dysfunction of the autonomic nervous system which controls heart rhythm, blood pressure, saliva glands, sweat glands, and the stomach; Plaintiff experienced blood pressure drops of 40 to 50 points without warning when she stood up, fainting palpitations, and fatigue), *report and recommendation adopted with modification by* 2009 WL 1457121 (N.D. Fla. May 22, 2009) (reversing and remanding the Commissioner's decision for further analysis).

On October 27, 2006, Dr. Miles had a follow up visit with Plaintiff to discuss her other test results, most of which were normal, and were intended to rule out other conditions. R. 708. However, the heart monitoring over the month-long period using an event recorder led Dr. Miles to believe (R. 708) that Plaintiff did *not* have paroxysmal supraventricular tachycardia as was originally diagnosed – although he could not completely rule it out – but she had a different condition:

> She transmitted 105 events during the period, consisting of fast heartbeat, palpitations, chest discomfort and shortness of breath. There were multiple tracings that showed mild sinus tachycardia. Occasionally the tachycardia was fast enough (about 160-170 per minute) that I cannot completely rule out a paroxysmal supraventricular tachycardia. The event monitor company read several of the tracings as having PVCs, but on careful inspection these are all artifacts, so I do not think that significant ventricular ectopy is present. I should note that the patient had an ablation of AV node reentrant tachycardia in 2002. She had a followup electrophysiology study in 2003, at which time no tachycardia was inducible.

R. 708. Dr. Miles confirmed that Plaintiff had a different impairment, dysautonomic syndrome and he discussed with her "the frustration" of managing the condition. R. 708. Previously, he "talked to her at some length about dysautonomic syndromes which are in the long run very difficult to treat,

---

[7]http://www.ndrf.org.

pharmacologic therapy ultimately not being very satisfying in a lot of patients." R. 713. He explained at the follow up visit on October 27, 2006:

> Impression and plan: The patient appears to have a dysautonomic syndrome. She has had multiple attempts at drug therapy in the past. She has never had Midodrine, but tells me that she is usually hypertensive, and therefore an alpha agonist like Midodrine is probably not going to be of any help. We spent some time talking about dysautonomic syndromes with both the patient and her husband, especially about the frustration related to the syndrome and its management. We talked about recent European data showing that isometric muscle contractions of the upper or lower extremity at the onset of symptoms abort symptoms in some patients. *I am not sure that adding any other medications to her regiment at this time would actually be of any value.* We talked about trying to individualize her Toprol does, with larger doses on bad days and smaller doses on good days. We talked about trying to [do] a little bit of conditioning, but not doing a fad diet, since she is a little concerned about her weight gain. She has multiple symptoms associated on monitor with clear sinus tachycardia and so I do not think the few tracings where sinus cannot be differentiated from the possibility of PSVT are significant enough that we should do another electrophysiology study. However, if she begins to have episodes of very rapid tachycardia in the future we can consider another electrophysiology study to rule out recurrent AV node reentry, which I think is unlikely and clearly does not account for the majority of her symptoms, given the multiple symptomatic transmissions that she has sent over the last month.

R. 709 (emphasis added).

In his decision, the ALJ failed to give any recognition whatsoever to the diagnosis by Dr. Miles, the cardiac specialist from Shands Health Center at the University of Florida. In fact, the ALJ *miscited* Dr. Miles report as Dr. Ahuja's (R. 59, citing Exhibit 38F/7-8)[8], and only selected the "normal" or positive health information to quote. While accidently misciting one cardiologist as the author of another's report (especially if they practice together for instance) might arguably not be of much consequence, it is in this case. Dr. Ahuja sent Plaintiff to Dr. Miles, a Professor in the Department of Medicine, Division of Cardiology, at Shands, presumably because Dr. Ahuja needed assistance in evaluating Plaintiff's challenging condition for diagnosis. A review of Dr. Miles'

---

[8]There is no page 8 in Exhibit 38F. It is not clear if the ALJ had exhibit confused with another exhibit, though he cites from the notes in Exhibit 38F.

-9-

treatment notes indicates that more extensive testing was required before he could diagnose Plaintiff, and even his ultimate diagnosis was not 100% certain because of the nature of the condition. R. 709. In fact, although Dr. Ahuja's treatment notes are in the file, they end on October 19, 2006, one week before Dr. Miles' treatment notes indicate that he diagnosed Plaintiff's condition, discussed it with her and dictated a letter to Dr. Ahuja explaining the diagnosis. Thus, Dr. Ahuja's notes *do not reflect anywhere* that he received Dr. Miles' ultimate diagnosis that Plaintiff actually had dysautonomic syndrome – affecting nervous system – and most likely *not* supraventricular tachycardia – affecting primarily the heart. *Compare* R. 681 with R. 709.

The ALJ pulled selected information from Dr. Miles' report and ignored other crucial information, such Dr. Miles' opinion that treatment could be "frustrating" or questioning whether in his opinion, adding *any* medication to Plaintiff's regimen would even be "of any value." *See* R. 709. Instead, the ALJ cites some language from Dr. Miles' report (as Dr. Ahuja's) indicating many test results were normal and ruled out certain cardiac conditions; however, Dr. Miles expected these tests to be normal since they were administered to rule out certain causes of Plaintiff's condition or to narrow it down to the condition he suspected, dysautonomic syndrome. *See* R. 713. The ALJ implies that Plaintiff's cardiac condition is either normal or mild:

> Dr. Ahuja saw the claimant again on October 27, 2006 to give her the results of recent testing. The claimant reported that the results of a stress test were normal and Dr. Ahuja stated that her urine tests were normal. Multiple tracings had shown mild sinus tachycardia. He said that although he could not rule out paroxysmal supraventricular tachycardia ["PSVT"], the event monitoring company had read several of the tracings as being artifacts. As a result, Dr. Ahuja did not think that any significant ventricular ectopy was present. He talked with the claimant about individualizing her Toprol, less on good days and more on bad days. Her weight had risen to 178 pounds and he discussed doing some conditioning, but not fad dieting. He concluded that she had clear symptoms of sinus tachycardia, but was of the opinion that there was insufficient evidence of PSVT to warrant another electrophysiology study (Exhibit 38F/7-8).

-10-

R. 59. Because the ALJ did not recognize Dr. Miles' report and his ultimate diagnosis, failing to distinguish the two cardiologists – and failing to even mention Dr. Miles' diagnosis of dysautonomic syndrome – his decision was not based on substantial evidence.

In addition, the ALJ relied on the erroneous testimony of the ME that Plaintiff's "heart was very strong and functioning as one would expect from a 29-year old" (R. 59) which he based solely on the single cardiolite stress test run by Dr. Ahuja. R. 57. The ME also failed to recognize that Dr. Miles had diagnosed Plaintiff's cardiac problems as caused by dysautonomic syndrome, although the ME said during the hearing that he had received Exhibit 38F (Dr. Miles' notes) from the ALJ. R. 744. The ME testified, "I don't see any particular diagnosis being made with regard to cardiovascular status." R. 756. Because the ALJ relied on the ME's testimony which failed to recognize Dr. Miles' report and his ultimate diagnosis, the ALJ's decision was not based on substantial evidence. The ALJ's decision will be reversed on these bases and remanded for reconsideration of Dr. Miles' opinion, any update to treatment records, and a consultative examination by a cardiologist if necessary.

However, the Court anticipates an issue may be raised as to Plaintiff's October 2006 diagnosis and her date of last insured, which the ALJ stated at the hearing was December 2004 (R. 779), but is listed as December 2005 in his decision (R. 53). Plaintiff testified that her condition began with an accident when she fell from a golf cart and was dragged 50 feet. R. 32-37[9], 526. Records from May 2000 indicate that Plaintiff was experiencing blackouts, dizziness, and loss of balance when standing up from bending over, pain in her neck, back, shoulder, and left leg, and numbness in both hands. R. 524. Plaintiff testified at the June 28, 2007 hearing that she has "a heart condition that causes me to black out, and my blood pressure gets extremely high and my heart rate gets extreme – dangerously

---

[9]Plaintiff's counsel submitted records documenting that accident, as part of Plaintiff's request for review of the ALJ's decision. R. 32-37.

-11-

high, actually, and then it drops very low, and I actually black out." R. 781. When asked if she knew what she had been diagnosed with, she testified, "I'm not sure. The last thing he said, it had something to do with postural something, but as far as I know it's super –" R. 781. The ALJ asked, "Orthostatic hypotension? Is that what he's saying?" R. 781. "I don't – I just know it as supraventricular tachycardia." R. 781. She testified that she was diagnosed with that condition prior to December 2004. R. 781. Her other symptoms related to her heart were "excruciating pain," problems standing up and feeling uneasy; or like she is going to black out when she stood up for any length of time or if she was sitting down and stood up quickly; or even when she was lying down. R. 782. She also had irritable bowel syndrome, fibromyalgia, and chronic fatigue syndrome, with symptoms of extreme weakness, sore joints, and stabbing pains. R. 782. Dr. Hoffen, the neurologist, confirmed trigger points over multiple areas of the shoulders and back suggestive for fibromyalgia in December 1999. R. 278; *see also* R. 493. Dysautonomic syndrome is often misdiagnosed as chronic fatigue syndrome, fibromyalgia, POTS, irritable bowel syndrome, or neurocariogenic syncope[10]. Plaintiff's symptoms, which included problems with the regulation of heart rate, blood pressure, fatigue, lightheadedness, feeling faint or passing out (syncope), and weakness are conditions treated by physicians in various specialties. Not surprisingly, Plaintiff was treated by her primary care doctor, an orthopedist, a neurologist, a cardiologist, an allergist, and a pain medicine specialist between 1999 and October 2006 when Dr. Miles finally made the diagnosis of dysautonomic

---

[10]One informational medical website summed it up as:
The severity of the symptoms in people with dysautonomia are typically far out of proportion to any objective physical or laboratory findings (especially when the doctors don't know which findings to look for) . . . . Patients lucky enough to be taken seriously by their family doctors are likely to be referred to a specialist. The type of specialist they are sent to usually depends on the predominant symptom they are experiencing, or on the symptom that most impresses the family doctor. And the diagnosis they are ultimately given depends on their predominant symptoms and which specialist they end up seeing. Thus: Those whose main complaint is easy fatigability are likely to be diagnosed with [chronic fatigue syndrome]. Those who pass out are labeled as vasovagal or neurocardiogenic syncope. . . . If dizziness on standing up is the chief problem, POTS is the diagnosis. Diarrhea or abdominal pain buys you irritable bowel syndrome. Pain elsewhere ends up being fibromyalgia. Richard N. Fogoros, http://heartdisease.about.com/cs/womensissues/a/dysautonomia.htm.

-12-

syndrome, after ruling out other cardiac conditions. On remand, the ALJ will determine the onset of Plaintiff's disability.

### B. Side effects of medications

Plaintiff claims that the ALJ erred by not articulating explicit and adequate reasons for rejecting her testimony about medication side effects on her ability to work. The Commissioner argues that the ALJ properly considered Plaintiff's side effects from medications.

At the June 28 2007 hearing, Plaintiff testified that she takes Percocet, Fiorocet, Soma, Cardizem, Toprol, Effexor, Xanax, Antivert "and several other allergy medicines." R. 745. She testified that the side effects from her medications include "drowsiness, dizziness, upset stomach," vomiting, and irritability. R. 785. Plaintiff points to the ALJ's statement at the hearing that: "I have taken Percocet, and I know that one thing it will do, if you take it regularly. It will slow you down, slow your thinking down, and I believe we've got a limitation on the capacity to deal with detailed instructions here." R. 762. Plaintiff contends the ALJ did not make findings concerning Plaintiff's testimony about drowsiness, dizziness, upset stomach, vomiting or irritability on her ability to work, except for the (inadequate) inclusion of a limitation in the RFC assessment that Plaintiff was capable of "simple routine work" (R. 60) where it is unclear whether this finding is the result of side effects of medications or some other mental limitation.

The Commissioner contends the ALJ explicitly considered the side effects of Plaintiff's medications, including when posing his hypothetical to the VE. In the hypothetical, the ALJ instructed the VE to consider the side effects of medications, including dizziness. R. 763-64. The ALJ also instructed the VE to consider that Plaintiff's medications affect her ability to understand and carry out detailed instructions and to maintain attention and concentration, and asked the VE to assume that the hypothetical individual was limited to simple, repetitive work. R. 764. With these

restrictions in mind, the VE testified that Plaintiff could do the work of an office helper, cashier, and hand packager. R. 765.

In light of the remand for consideration of Plaintiff's diagnosis of dysautonomic syndrome, the ALJ will be required to consider the evidence of side effects from Plaintiff's medications, in light of her other impairments.

**C.     Hypothetical to the VE**

Plaintiff argues that the medical evidence reflected low GAF scores, and a serious impairment in social, occupational and school functioning, which the ALJ should have considered and found Plaintiff incapable of any other work in the national economy. Although the ALJ did not include Plaintiff's GAF scores in his hypothetical, Plaintiff's counsel did ask the VE whether she would be able to perform any work when GAF scores of 50 and 56 were included and the VE testified she would be unable to perform any work. R. 767. The Commissioner contends that the GAF score should not be considered under the regulations, and the ALJ was not required to rely on the VE's testimony regarding the GAF score of 50 because it was inconsistent with the other evidence of record.

The Plaintiff is correct that case law in this circuit requires that the ALJ employ hypothetical questions which are accurate and supportable on the record and which include all limitations or restrictions of the particular claimant. *Pendley v. Heckler*, 767 F.2d 1561 (11th Cir. 1985). Where the hypothetical employed with the vocational expert does not fully assume all of a claimant's limitations, the decision of the ALJ, based significantly on the expert testimony, is unsupported by substantial evidence. *Id.* at 1561 (quoting *Brenam v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980)).

Plaintiff points to the opinions of Rosimeri Clements, Psy.D., the consultative examiner, who completed an independent evaluation of Plaintiff on July 31, 2003 and gave her a GAF score of 56

(R. 538-40. In a second consultative examination on January 6, 2004, Dr. Clements gave Plaintiff a GAF score of 50 (R. 556), which Plaintiff cites as indicating "a serious impairment in social, occupational or school functioning." Doc. No. 13 at 13 (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (2000) at 34). The ALJ relied on the opinion of Dr. Clements (R. 62), but did not discuss the GAF scores assigned to Plaintiff either in the ALJ's decision or included in the hypothetical. At the administrative hearing Plaintiff's counsel asked the VE what effect a GAF score of 50 would have on the three positions of office helper, cashier and hand packager, and the VE testified, "That would eliminate all three positions" R. 767. Plaintiff argues that it was error for the ALJ to fail to state the weight if any that he gave to the VE's opinion that Plaintiff could perform no other work with a GAF of 50, and to find Plaintiff capable of other work in light of the VE's testimony.

The Commissioner contends that the GAF scale in not required to be considered in the disability programs, because the GAF scale "does not have a direct correlation to the severity requirements in our mental disorders listings," citing Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,746, 50,764-65 (Aug. 21, 2000). The Commissioner also argues that a GAF score may also have little or no bearing on the individual's work-related functioning, because a GAF score merely represents a snapshot opinion regarding an individual's symptoms or possible difficulty in social, occupational, or school functioning at the time of the evaluation, citing American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 32-34 (4th ed. 1994) (DSM IV).

The ALJ was not *required* to consider Plaintiff's GAF scores standing alone, however, in light of the remand for consideration of Plaintiff's diagnosis of dysautonomic syndrome, the ALJ will be required to consider the evidence, if applicable, of any mental impairment from Plaintiff's condition.

-15-

### D. Daughter's testimony

Plaintiff contends that the ALJ erred in not allowing Plaintiff to call her daughter as a corroborating witness during the hearing, and in not indicating in his decision that he gave the daughter's proffer any weight. The ALJ denied Plaintiff's request, saying, "I'll accept without any proof that her daughter is going to confirm everything she says, and it's not going to be of any help to us to repeat it. . . Let's don't waste time. Okay?" R. 769. The Commissioner argues that the daughter's testimony would not have added any new information since it would have been redundant of Plaintiff's testimony, and there is no indication that the ALJ did *not* consider it.

While it is difficult for the Plaintiff to counter the negative inference the Commissioner argues, in light of the Court's other findings and recommended remand, the ALJ will be required to consider testimony of Plaintiff's daughter if Plaintiff wishes to call her as a witness and she has testimony that would not be redundant of Plaintiff's.

## *CONCLUSION*

Because the Court finds the ALJ's decision misciting and omitting Dr. Miles' diagnosis of Plaintiff's condition as dysautonomic syndrome was not supported by substantial evidence, it is respectfully **RECOMMENDED** that the decision be **REVERSED** and **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g). It is respectfully recommended that the ALJ be ordered on remand to obtain outstanding treatment records from Dr. Miles, Dr. Ahuja, and any other cardiologists, as well as any new medical records or RFC assessments from other treating physicians, conduct a supplemental hearing with additional testimony from Plaintiff and, a cardiac medical expert and a vocational expert; reevaluate Plaintiff's pain complaints and non-exertional limitations and residual functional capacity based on the expanded record under the applicable rulings

and regulations; and the Clerk of the Court be directed to enter judgment consistent with this opinion and, thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on July 9, 2009.

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Courtroom Deputy